Proceeding under North Carolina Workmen's Compensation Act to determine liability of defendants to claimants. *Page 359 
Upon the hearing before single Commissioner of the North Carolina Industrial Commission, evidence was offered tending to show that on 17 July, 1939, Dean Gilmore, age 65 years, intestate of claimants, while washing windows in the new gymnasium of Hoke County High School, suffered injury to his right leg, breaks in two places, when the ladder on which he was standing slipped from under him; that Dr. G. W. Brown administered first aid and sent him to Highsmith Hospital, where Dr. J. F. Highsmith, Jr., attended him; and that Dr. A. L. O'Briant treated him for more than a month prior to his death on 28 February, 1940. These doctors, each admitted to be an expert in medical profession, testified as to his physical condition, and as to cause of his death in pertinent part as follows:
The testimony of Dr. G. W. Brown, in substance, is as follows:
That he treated Dean Gilmore in the new gymnasium after his injury on 17 July, 1939, bandaged his leg and sent him to Highsmith Hospital; that he, Gilmore, was suffering pain in his leg, but, at that time, did not complain of anything else; that he, the doctor, went to the hospital about a week afterward, and at that time Gilmore complained of pain in his stomach, suffering from retention of urine — his bladder affection; that, to question as to the cause of this retention of urine in the bladder at that time, the doctor answered, in his opinion as an expert, that Gilmore, "had a mild form of cystitis, and his high arteriosclerosis, and enlarged prostate gland which all old people are subject to, which encroaches upon the stem of the bladder," which conditions were not caused by the accident; that he didn't think the fall had anything to do with causing this retention of urine in his bladder; that the accident itself did not so aggravate his condition in any way to cause it, "but being confined to the bed might have a little connection because at this time he had been used to leading an active life, and he had been confined to bed for a week — possibly something like a week at this time — and he had an extension on both his legs and possibly the close confinement could possibly have aggravated his bladder condition." And, continuing, the doctor stated that, having been his physician for twenty-five years, he had occasion to treat and examine Gilmore prior to the accident; that he treated him after he came from the hospital, until he went to Duke Hospital "about the last of October or the first of December"; removing the cast on 17 October; that he did not advise his going to Duke, "but owing to his condition he had become a little childish and was begging everybody to do something for him and he wasn't getting any better and the medicine he was taking wasn't doing him any good and he wanted to go somewhere where he thought they would be able to do him some good"; that at that time the most of his complaint "was shortness of breath and pains all over the body," none of which in his (the doctor's) opinion was caused *Page 360 
by the accident; that he, the doctor, knew that Gilmore, when last seen by him, had a disease, "general arteriosclerosis and arthritis," "which would eventually kill him"; "that his fingers were all swollen up and he had mitral-regurgitation of his heart"; that at that time he (Gilmore) didn't complain of his bladder; that he was swollen considerably and he had a septic orchitis from his bladder infection; that at that time Gilmore was walking about a little on crutches, and the condition of the fractured leg was good as far as he (the doctor) could tell; that, in his opinion, he did not think Gilmore, if he had lived, would have had any permanent disability due to the "original injury by accident"; that as result of the fracture he would have had no stiffness in his joints; that "his motion was limited, but it was caused from his arthritis, and his mitral-regurgitation; that his legs were swollen right considerably and caused from the condition of his heart." Finally, the doctor was asked: "So, in your opinion, this limitation of motion of the right leg was due to other causes other than the fracture? A. (Nod of the head.)"
Dr. J. F. Highsmith, Jr., in summary, testified:
Gilmore "was admitted to the hospital . . . about one hour after his accident. He had a fracture of the right tibia and fibula just below the knee and I don't recollect him complaining of anything other than his broken leg at that time. While he was in the hospital he had considerable trouble with his bladder which was due to enlarged prostate and being confined to his bed and he couldn't empty his bladder and required intermittent catherization . . . I reduced his fracture, applied a cast which I left on about six weeks. He . . . stayed in the hospital from the 17th through the 30th of July. He returned to the hospital in about six weeks, had his cast changed and at that time he had remarkably good union of his fracture for a person of his age . . . I re-applied his cast to stay on for another month or six weeks. He came back shortly after I re-applied his cast wanting me to remove it and I wouldn't because I didn't think it was sufficient time elapsed to remove his cast, and I never saw him any more . . . At the time he was in the hospital . . . his blood pressure was elevated. He had a marked generalized arteriosclerosis but during the time in the hospital his heart action was good, didn't show any signs of any decompensation, any failing compensation . . . A man of his age, I should think he would have been totally disabled for a minimum of from five to six months . . . At the rate he was going, I don't believe he would have had any disability other than probably a little limitation of motion in his knee but that was just probable . . . he was getting most remarkable results . . ."
Continuing, Dr. Highsmith testified that he was not familiar with the cause of Gilmore's death; and that Gilmore said he had not been having any bladder trouble prior to this accident. Then he gave as his opinion *Page 361 
that "his (Gilmore's) bladder condition could have been caused from lying in bed, his inability to pass his water." The doctor said "I imagine before that time he had been getting up to pass his water just like anybody else; he wouldn't hardly urinate lying down." Then, continuing, the doctor said that, upon examination of Gilmore, he found that he had "marked hardening of the arteries." And in reply to this question, "What other chronic condition did he have, prostate condition, and bladder condition resulting, and arteriosclerosis, and what else?" the doctor said, "That is about all I remember except he was prematurely old for his age. He gave a history of past two years of suffering from attacks of palpitation of the heart, intermittently associated with pain over his heart, and dizziness and when walking a tendency to fall to the right . . . I mentioned a while ago he didn't show any failing (of his heart) in the hospital; his heart action was good. His blood pressure, however, was elevated, 154/100."
Dr. A. L. O'Briant testified substantially as follows:
That according to his records he treated Gilmore on January 15th, 18th and 19th, and also February 27th, 1940, the last being the day before he died; that this was in "his final illness"; that at the time of this treatment the cast had been removed; that he made out the death certificate, and, to the best of his memory, he put on it, as the cause of death of Gilmore, chronic myocarditis and multiple arthritis; that he is sure he put chronic myocarditis — a condition of the heart; that multiple arthritis is an arthritis in several joints instead of one; that he didn't treat Gilmore for his bladder condition; that as he recalls, Gilmore did not at that time complain of bladder trouble; that he examined Gilmore's arteries and found them sclerosed; that he examined Gilmore's leg, and, the best he could make out, his leg was apparently well, that is, quoting "I mean as far as I could see on external examination; no swelling or deformity I could make out."
Then, continuing, in answer to hypothetical questions, Dr. O'Briant, after noting a distinction between proximate cause and contributory cause, and after stating that in his opinion the accident was a contributing cause of the death of Gilmore "due to the fact that the injured man was an aged person, and the injury necessitating confinement, which in my opinion — and the age — is detrimental to convalescence from various injuries," was asked: "Q. Doctor, do you have an opinion satisfactory to yourself as to whether the retention of the urine caused by this bladder complication in any way tended to aggravate or make worse the chronic myocarditis you described?
"A. Not any more than absorption from the retention of urine; that would aggravate his myocarditis. *Page 362 
"Q. Do you have an opinion satisfactory to yourself as to whether the retention of the urine due to the inability to eliminate from the bladder contributed to or aggravated the multiple arthritis?
"A. I think it possibly did.
"Q. How about the probability of it?
"A. It is most probable that it did. Of course, I didn't treat him for his prostatic condition, I am assuming he had retention."
Following these questions, Dr. O'Briant stated that arteriosclerosis, hardening of the arteries, and myocarditis which he "found present, and the immediate cause of his death were diseases of long standing," gradual development, and in themselves, independently, could have caused "this man's death," and frequently do cause death in men of his age and condition, and, as well as he remembers, "they were the primary causes of his death" as he listed it on the death certificate, and he thinks the contributing cause was multiple arthritis, and that he didn't mention the accident as being a contributing cause, and, in answer to question, "In your opinion, Doctor, wasn't the accident a remote cause if it did contribute at all? Wasn't it a remote cause?" the doctor said: "Yes, sir, I suppose you would call it remote."
Then, upon being asked by the Commission, "What was your answer to Mr. Sapp about a remote cause, that the accident was a remote cause? Explain that," the doctor said: "Well, remote, in other words, it is not an immediate or direct cause"; and that the accident didn't cause arteriosclerosis or myocarditis — one a "disease of the heart and muscle of the myocardium, and the other . . . the blood vessel." Finally these questions were asked by the Commissioner, and answered by Dr. O'Briant:
"Q. Dr. Highsmith testified in his opinion this inability of Dean Gilmore to properly eliminate or void his bladder was caused by lying in bed, and the lying in bed was the result of the fracture to the leg. Do you have an opinion satisfactory to yourself as to whether this inability to void would tend to aggravate or be the proximate cause of the flaring up of the arthritis and chronic myocarditis?
"A. Well, possibly, yes; probably for the arthritis, but I wouldn't say about the myocarditis.
"Q. Well, does the arthritis tend to aggravate or cause the flaring up of the chronic myocarditis?
"A. It does, yes.
"Q. So one aggravates one and that in turn aggravates the other?
"A. Yes, sir."
Evidence was also introduced regarding employment.
The Commissioner, before whom the case was heard, among others, found as a fact, "That on February 28, 1940, Dean Gilmore died as a result of the injury by accident that arose out of and in the course of his *Page 363 
employment by the Board of Education of Hoke County on July 17, 1939," and concluded as a matter of law, among others: "That the deceased sustained an injury by accident that arose out of and in the course of his employment by the Board of Education is sustained by all the evidence. That his death from this injury on February 28, 1940, is the opinion given by the medical experts and adopted as a finding by the Commission."
Upon such findings of fact and conclusions of law, an award of compensation was made against defendants Hoke County Board of Education and Travelers Insurance Company from which they appealed to the Full Commission.
Upon such appeal, and after hearing, the Full Commission finds as facts, among others, "A. That the plaintiff's deceased, Dean Gilmore, sustained an injury by accident on July 17, 1939, arising out of and in the course of his regular employment with defendant employer, Hoke County, . . .
"E. That the injury by accident which the deceased employee, Dean Gilmore, sustained on July 17, 1939, activated an(d) exaggerated a pre-existing, latent condition or disease, which said activation and/or exaggeration of said condition or disease caused said deceased employee, Dean Gilmore, to be totally disabled from the date of his injury by accident on July 17, 1939, to the date of his death on February 28, 1940; that the death of the deceased employee, Dean Gilmore, resulted naturally and unavoidably from an activation or exaggeration of a preexisting, latent condition or disease, which said exaggeration or activation was directly and proximately caused by the injury by accident which he sustained on July 17, 1939."
The Full Commission further adopted as its own and in all respects affirmed and approved the findings of fact and conclusions of law of the single Commissioner, and further concluded, in pertinent part: "3. . . . that the deceased employee at the time he sustained his injury by accident arising out of and in the course of his regular employment on July 17, 1939, was exclusively an employee of the Board of Education of Hoke County, and, therefore, that the defendant, the State School Commission, is not liable for any compensation on account of his said death"; and "4," after quoting the provisions of Section 2 (f) of the Workmen's Compensation Act, Public Laws 1929, chapter 120, Michie's Code, 8081 (i), as follows: "`Injury' and `personal injury' shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident," and a portion of section 38 of the Act, Michie's Code, 8081 (tt), which reads: "If death results proximately from the accident and within two years thereafter, or while *Page 364 total disability still continues, and within six years after the accident, the employer shall pay for or cause to be paid, subject, however, to the provisions of the other sections of this Act in one of the methods hereinafter provided, to the dependents of the employee . . .," and, after stating that "In the case at bar the Commission has found as a fact that the death of the deceased employee resulted naturally and unavoidably from an exaggeration of a pre-existing condition or disease, which aggravation of the condition or disease was caused by the accident," and that "the Commission has consistently held that the disability resulting from the aggravation of a pre-existing, latent condition by an accident is compensable," the Commission concludes: "Therefore, it appears to the Full Commission upon a liberal construction of the foregoing provisions that the dependents of a deceased employee are entitled to compensation when the death of an employee results from an exaggeration or activation of a condition or disease when said activation results naturally and unavoidably from the accident."
The Full Commission further concludes: "In the case at bar the defendants contend that death did not result proximately from the accident and therefore that the widow is not entitled to compensation. Assuming that this contention is correct, which the Full Commission is not making a conclusion of law, the Commission has found as a fact, and in its opinion there is ample competent evidence to support the same, that death resulted while total disability of the employee still continued and within six years after the accident, and, therefore, that the said dependent is entitled to compensation for the death of the deceased employee."
Thereupon, compensation was awarded.
Upon appeal thereto by defendants, Hoke County Board of Education and the Travelers Insurance Company, the judge of Superior Court, being of opinion that there is sufficient evidence to support the Commission's findings of fact and that its decision and award are free from error of law, entered judgment affirming same. Said defendants appeal therefrom to Supreme Court and assign error.
These questions present points decisive of this appeal: (1) If it be conceded, that on 17 July, 1939, Dean Gilmore suffered injury by accident arising out of and in the course of employment by *Page 365 
Hoke County Board of Education, is there sufficient competent evidence to support a finding of fact that his death on 28 February, 1940, resulted proximately from such injury? (2) If not, and it be conceded that his death, on 28 February, 1940, did not result proximately from accident which happened on 17 July, 1939, but did occur while total disability continued and within six years after the accident, is the employer liable for compensation for his death under the provisions of section 38 of the North Carolina Workmen's Compensation Act, Public Laws 1929, chapter 120?
Both questions must be answered in the negative.
(1) In considering the first question it is necessary to ascertain when, under the North Carolina Workmen's Compensation Act, compensation is allowable for death of employee. Adverting to provisions of the Act, defining words used therein, unless the context otherwise requires, "the term `death' as a basis for a right of compensation means only death resulting from an injury," section 2 (j), and "`injury' . . . shall mean only injury by accident arising out of and in the course of employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident." Section 2 (f). And in providing compensation for death, the Act, section 38, prescribes that "if death results proximately from the accident and within two years thereafter, and while total disability continues, and within six years after the accident, the employer shall pay or cause to be paid . . . to the dependents of the employee . . . a weekly payment equal to sixty per cent of his average weekly wage," etc.
From these provisions the legislative intent is clear that, under the North Carolina Workmen's Compensation Act, the employer shall pay compensation for death of employee only when the death results proximately from injury by accident arising out of and in the course of employment. The injury by accident must be the proximate cause, that is, an operating and efficient cause, without which death would not have occurred. And to establish a real relation of cause and effect between an injury to, and subsequent death of employee, the evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation between the injury and subsequent death.
When the evidence in the case in hand is tested by these rules the causal relation between the injury to Dean Gilmore on 17 July, 1939, and his death on 28 February, 1940, is conjectural. All the medical testimony is to the effect that Gilmore had general arteriosclerosis and arthritis, diseases "which would eventually kill him," and that he had an enlarged prostate gland, but there is no evidence that these diseases *Page 366 
were caused by the injury to his leg. On the contrary, the evidence tends to show that they were of long standing and gradual development. The evidence is that arteriosclerosis, hardening of the arteries, and myocarditis were "the immediate causes" — "the primary causes" of his death, and that multiple arthritis was a contributing cause. And in the light most favorable to claimant, the evidence is that if the accident did contribute at all, it was, in the opinion of Dr. O'Briant, who attended Gilmore in his last illness, a remote cause — "remote . . . not immediate or direct cause." Even so, this opinion is, as the doctor said, based upon the assumption that there was retention of urine in the bladder. And the only evidence of such retention related to the period when Gilmore was confined in the hospital, July 17 to July 30, for afterwards, when Dr. Brown last saw him, before he went to Duke, he was not complaining of his bladder trouble, and Dr. O'Briant did not treat him for it in his last illness.
The cases of Williams v. Thompson, 200 N.C. 463, 157 S.E. 430; Clarkv. Cotton Woolen Mills, 204 N.C. 529, 168 S.E. 816; and Doggett v.South Atlantic Warehouse, 212 N.C. 599, 194 S.E. 111, are distinguishable in factual situation from that in present case.
(2) As to second question, the fundamental condition upon which compensation may be allowed under section 38 of the North Carolina Workmen's Compensation Act is that death must have resulted "proximately from the accident." Under that section there are two conditions precedent to allowance of compensation: (1) If death results proximately from the accident and within two years thereafter, compensation will be granted; (2) if death results proximately from the accident, while total disability still continues and within six years after the accident, compensation will be granted. But, in either event, whether death occurs within two years after the accident, or while disability still continues, and within six years after the accident, compensation is only allowed for death which "results proximately from the accident."
Under these rules, death having occurred within two years after the accident, the case in hand is tested by the first condition. The second condition is not applicable. Hence, holding as we do, upon evidence of record, that the death of Gilmore did not result proximately from the accident, compensation is not allowable.
While the North Carolina Workmen's Compensation Act should be liberally construed so as to effectuate the legislative intent which is to be ascertained from the wording of the Act, the rule of liberal construction cannot be extended beyond the clearly expressed language of the Act. "It is ours to construe the laws and not to make them," Hoke, J., in S. v.Barksdale,181 N.C. 621, 107 S.E. 505; Wilson v. Mooresville, ante, 283, and cases cited. *Page 367 
It is proper to note that the Industrial Commission, finding that notice of claim therefor as required by the statute was not filed by the employee or by claimants, denied an award for disability between the date of injury and date of death of employee, and for medical expense, and that claimants have not appealed.
The judgment below is
Reversed.